FOURTH DIVISION
DILLARD, P. J.,
RICKMAN and PIPKIN, JJ.

NOTICE: Motions for reconsideration must be physically received in
our clerk's office within ten days of the date of decision to be deemed
timely filed.

https://www.gaappeals.us/rules-1-8/

October 11, 2023

# In the Court of Appeals of Georgia

A23A0633. SIMMS v. STEWART.

PIPKIN, Judge.

In July 2016, several days before her death, Lezli Dicie Hall executed a quitclaim deed conveying certain real property located in Gwinnett County, Georgia (the "Property"), to herself and her friend Appellant Robin Ann Simms, making them joint tenants with rights of survivorship. Almost four years later, Hall's son, Dwight Allan Stewart, as administrator of her estate ("Estate"), filed a complaint in equity to cancel the deed, alleging, among other things, that the deed was the product of undue influence. A jury found in favor of the Estate, and Simms filed this appeal, arguing that the trial court should have granted her motion for a directed verdict; that she was unfairly prejudiced by the trial court's failure to instruct the jury, without request, on the law governing inter vivos gifts; and that the trial court erred by admitting certain impeachment evidence at trial. As more fully set forth below, we agree with

Simms that the trial court's instructions to the jury resulted in substantial error entitling her to a new trial.

Pertinent to this appeal, the evidence adduced at trial shows that Hall and Simms had been friends since 1999 or 2000. Around that same time, Simms, who was living in Atlanta, purchased the Property but she defaulted on the loan and the lender foreclosed.[1] Hall, who resided in New Jersey, was considering retiring to the Atlanta area and purchased the Property from the lender. Hall lived at the Property for a time and Simms sometimes assisted her with the Property. In 2015, Hall leased the Property and moved back to New Jersey to live with Stewart and his family.

Sometime in February 2016, Hall contacted Simms and told her that she had just been released from the hospital and was in a nursing home. Simms, who was by then living in the Maryland area, traveled to New Jersey to visit, and Hall disclosed she had been diagnosed with cancer. For the next several months, Simms regularly traveled to New Jersey to visit Hall and, starting in March 2016, would accompany her to doctor's appointments. In April 2016, Hall's condition worsened, and she was again hospitalized. Hall told Simms that she had been advised that there was nothing more that could be done to treat her cancer and they discussed next-step options. Hall did not want to enter in-patient hospice care, and Simms invited Hall

---

[1] Simms testified that she purchased the Property to help someone out but that person did not live up to his end of the obligation and the lender ultimately foreclosed.

to come live with her in Maryland. Hall agreed and when Simms arrived at the hospital to transport Hall to Maryland, a social worker informed Simms that Hall had granted Simms full power of attorney.

Simms testified that a year or so earlier, Hall had talked to Simms about buying the Property, and Simms said these discussions resumed in April 2016 after Hall learned her condition was terminal. Hall recorded a statement to the effect that she wanted Simms to purchase the Property but not until July; this recording was played for the jury. Simms testified that the timing issue related to when the reduction of principal under a loan modification would take effect.

Simms testified that they did not discuss disposition of the Property again until June 2016, when Hall asked her to have an attorney prepare a quitclaim deed. Simms said she questioned Hall about why she wanted to have a deed prepared, and Hall told her that she wanted to protect Simms because Simms had protected her. A Georgia attorney prepared the deed, which was dated June 23, 2016. Simms explained that the deed was not executed until July 6, 2016, because of the timing of the loan modification. Simms testified that her understanding was that Hall was giving her the Property with the expectation that Simms would make repairs to the Property.

Hall was in the hospital at the time she executed the deed, and, in addition to Simms, a social worker, a witness, and a notary were also present. Deborah Harris, the notary,[2] testified that she spent about an hour in the room with Hall prior to execution of the deed and that Hall was alert, in good spirits, and discussed her friendship with Simms. Harris had previously executed an affidavit concerning her notarization of the deed, and, when questioned about the affidavit at trial, Harris confirmed her averments that Hall was aware she was executing the deed, that she did so "willingly and as a free act[,]" and that Hall stated that she wished to give the Property to Simms. In addition to the deed, Harris said she also notarized a document detailing Hall's wishes for her funeral; this document was also admitted into evidence at trial.

The social worker who was present at the deed signing wrote up notes the day after the signing, and the trial court ruled these notes inadmissible prior to trial. However, during cross-examination, Simms was asked whether, at the time the deed was executed, she made any statements about purchasing the Property and the proceeds going to Stewart. Simms denied making any such statement, and the Estate's counsel, over objection, was allowed to impeach her with a statement contained in the social worker's notes that "[Simms] reported that [Hall] . . . and her son have agreed that [Simms] would purchase the [Property] and give the money to [Stewart]." Simms maintained at trial, however, that there was not an agreement between Hall, Stewart, and herself regarding the Property, and that while previously there was an

---

[2] The other witness to the deed execution died in 2021, prior to the trial in this case.

agreement for her to purchase the Property, at the time the deed was executed, it was Hall's intent to transfer the Property to her.

Hall died on July 9, 2016. Simms met with Stewart to go over funeral arrangements but did not mention the quitclaim deed. In August 2016, Simms had the Property appraised and learned that the value of the Property only slightly exceeded the amount still owed on the mortgage. About a month later, Stewart discovered that Hall had deeded the Property to Simms. Over the next several years, Simms continued to make mortgage payments and extensive repairs and improvements to the Property.

In April 2020, almost four years after Hall's death, Stewart, as administrator of his mother's estate, filed the present action seeking to cancel the quitclaim deed based on mental incompetency due to illness and medication, duress, undue influence, and forgery. Simms answered and filed a counterclaim for unjust enrichment seeking the amounts expended for upkeep, repairs and mortgage payments in the event that the deed was canceled. The case was tried before a jury, and after presentation of the Estate's case, the trial court granted a directed verdict on the Estate's claims for incompetence due to illness and medication, duress and fraud, leaving extant only the claim of undue influence. The jury found in favor of the Estate on the claim of undue influence and then awarded Simms $69,800 on her claim for unjust enrichment. Simms timely filed this appeal.

I. We turn first to Simms' contention that the trial court erred by failing to instruct the jury on the law governing inter vivos gifts.

According to the Estate's theory of the case, Hall had intended that Simms purchase the Property and pay Stewart the proceeds from the purchase but that Simms unduly influenced Hall to transfer the Property by deed to her instead. Simms acknowledged the initial agreement was for her to purchase the Property and give the money to Stewart but, according to her testimony and theory of the case at trial, Hall changed her mind and instead decided to gift her the Property with the understanding that Simms would fix up the Property, which remained in a state of disrepair.

In relation to these claims, the jury was charged as follows:

A deed to transfer property is a form of contract.

Parties are barred from introducing parol evidence, which are oral conversations, as a means of placing conditions on a quitclaim deed that is absolute on its face.

If one should transfer valuable property to another and the other person should accept the property, the law would imply a promise on the part of the other person to pay the reasonable value of the property.

The trial court also charged the jury on what constitutes a confidential relationship — where one party is so situated as to exercise a controlling influence over another — and undue

6

influence sufficient to cancel the deed. Simms does not take issue with these particular instructions but argues that the charge was incomplete – that the trial court had a duty, even without request and even in the absence of an objection, to also charge the jury on the law of inter vivos gifts.[3] The trial court's failure to do so, according to Simms, constituted substantial error entitling her to a new trial. We agree.[4]

"It is the duty of the trial court, whether requested or not, to give the jury appropriate instructions on every substantial and vital issue presented by the evidence, and on every theory of the case." (Citation and punctuation omitted.) Choi v. Sierra Constr. Co., Inc., 366 Ga. App. 107, 110 (2) (879 SE2d 838) (2022). However, as a general matter, in civil cases this Court does not review a claim of error based on the failure to give a particular instruction to the jury unless the party asserting error objects at trial. OCGA § 5-5-24 (a). Nevertheless, under subsection (c), "regardless of whether objection was made," we are required to "consider and review erroneous charges where there has been a substantial error in the charge which was harmful as a matter of law[.]" Id. at (c).

> Reversals by reason of erroneous jury charges to which no exceptions are taken are generally those in which (1) there was an erroneous presentation of the sole issue for decision or (2) it is of a kind which would have been likely to

---

[3] See OCGA § 44-5-80 (providing that a donor must intend to give the gift, the donee must accept it, and the gift must be delivered).

[4] We recognize that fashioning the charge in this case was challenging and that the parties and the trial judge endeavored during numerous charge conferences to craft proper jury instructions.

influence the jury either to find against the defendant or to return a larger verdict than it might have otherwise done or (3) it is blatantly apparent and prejudicial to the extent that it raises the question of whether the losing party has, to some extent at least, been deprived of a fair trial because of it or (4) a gross injustice is about to result or has resulted directly attributable to the alleged errors.

(Citation omitted.) Durham v. Dollar Tree Stores, Inc., 360 Ga. App. 548, 552 (2) (859 SE2d 620) (2021). As we similarly explained in Maki v. Real Estate Expert Advisors, Inc., 358 Ga. App. 337 (855 SE2d 72) (2021),

A charge constituting substantial error is one that is harmful as a matter of law – i.e., blatantly apparent and prejudicial to the extent . . . it raises the question of whether the losing party has, to some extent, at least been deprived of a fair trial because of it, or a gross injustice is about to result or has resulted directly attributable to the alleged errors.

(Citation and punctuation omitted.) Id. at 340 (1). It remains true though that reversals under this subsection are "very rare." (Citation and punctuation omitted.) Id. at 341 (1).

The Estate urges that Simms is not entitled to reversal based on the trial court's failure to give a charge on inter vivos gifts because she did not raise it in her answer, summary judgment motion, or as a defense at trial. However, it was evident from the evidence at trial that the question of whether Hall intended to gift Simms the Property – as opposed to transferring it to her with the understanding she pay for it – was at the heart of this case.

8

Indeed, the Estate acknowledged this in its response to Simms' summary judgment motion when it identified a genuine issue to be tried "as . . . whether . . . Hall wanted to sell the Property to [Simms] or wanted to gift the Property to [Simms]" — and specifically listed this as a genuine issue for trial under the heading of its claim for undue influence.

The Estate also argues, however, that even if it was error to fail to instruct the jury on inter vivos gifts, that error was harmless because the claim of undue influence, about which the jury was thoroughly charged, assumed a valid transfer. In other words, as we understand the Estate's argument, it did not matter whether Hall intended to gift Simms the Property if she was unduly influenced to do so. While we might agree with this assertion if the undue influence instruction was viewed in isolation, the jury here was also told that, in the usual course of events, Simms would have paid for property that was deeded to her. Thus, the jury could have been more inclined to find that Simms must have unduly influenced Hall because, otherwise,

Hall would not have deeded the Property without expectation of payment.[5] Moreover, while the jury was provided a roadmap which might have led them to find undue influence, they were not given any instructions that provided an alternate route to finding that Hall intended to gift

---

[5] Indeed, during the charge conference when Simms' counsel initially opposed the charge on presumption of payment, the Estate's counsel responded: "The whole point of the undue influence is that ordinarily you would pay for it, but if you unduly influence someone to get them to give it to you, they didn't pay for it. That's the whole point of undue influence. So this is basically saying — it's almost like this is what the normal standard is. But if there is undue influence, then that standard changes."

Simms the Property. Under the facts here, the omission of the charge on inter vivos gifts[6] was so blatantly apparent and prejudicial that it raises the question of whether Simms was deprived of a fair trial. Maki, 358 Ga. App at 342 (I). Accordingly, the judgment must be reversed and the case remanded for further proceedings consistent with this opinion.

2. In light of our holding in Division I, we need not address Simms' contention that the trial court should have directed a verdict on Stewart's claim of undue influence. Maki, 358 Ga. App. at 337 n.3. And we also decline to address Simms' challenge to the admission of the impeachment evidence, since we cannot predict how the evidence will unfold when the case is retried.

Judgment reversed and case remanded. Dillard, P. J., and Rickman, J., concur.

---

[6] Of course, it would be up to the trial court and the parties to precisely tailor the charge to fit the issues and evidence presented at trial.